34

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 2 5 1999

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| GILBERTO M. RODRIGUEZ, | § | |
| INDIVIDUALLY AND ON BEHALF OF | § | |
| HIS MINOR DAUGHTER, MEGAN | § | |
| SUZANNE RODRIGUEZ, AND | § | |
| STEPHEN L. WILLIAMS AND WIFE, | § | |
| ROBYN S. WILLIAMS, SURVIVING | § | |
| BENEFICIARIES OF THE DECEASED | § | |
| | § | |
| V. | § | CIVIL ACTION NO. B-98-163 |
| | § | |
| | § | |
| CITY OF HARLINGEN, TEXAS; | § | |
| R.D. MOORE; | § | |
| AND | § | |
| JIM SCHEOPNER | § | |

### PLAINTIFFS RODRIGUEZ' SUPPLEMENTAL RESPONSE
### TO DEFENDANTS' SECOND SUPPLEMENTAL BRIEF

TO THE HONORABLE JUDGE TAGLE, U.S. DISTRICT COURT:

Come now the Plaintiffs, pursuant to the Court's request, and file this SUPPLEMENTAL RESPONSE to Defendants' Second Supplemental Brief in Support of the Defendants' Motions to Dismiss under F.R.C.P. 12(b)(6) and Individual Defendants' Motion to Dismiss under F.R.C.P. 12(b)(6) based on qualified immunity. After discussing the Defendants' objections to the affidavit testimony offered by Plaintiffs, the Court at the hearing held on August 12, 1999, considered the arguments of counsel and requested briefing on three topics: whether Defendant Moore acted under color of law, was there a special relationship between the Defendants and the Plaintiffs, and what further distinctions could be made between the facts of the case at bar and those of the *Saenz* case.



# I. RUBIO AFFIDAVIT

At the hearing held on August 12th, the Defendants objected to the Affidavit of HPD Lt. Jose Rubio, Jr. urging that the Court not consider affidavits or testimony outside of the pleadings. As it became apparent at the hearing, some discussion of the evidence is necessary to a complete understanding of the allegations made in the Plaintiffs' amended complaint. Defendants' objection is not effectual since the issues involving a special relationship and state-created danger necessarily turn on the facts and circumstantial evidence. At Defendants' insistence there has not yet been discovery in this case, thus Plaintiffs should be entitled to proffer the sworn testimony of an officer within the Harlingen Police Department. As a senior ranking officer, Lieutenant Rubio's testimony is relevant and germane as it relates to common and proper procedure within the department. The evidence is in a form allowed to be presented in a summary judgment procedure, and thus certainly is relevant and allowable in a 12(b)(6) hearing. In *Celotex Corp v. Catrett,* 477 U.S. 317, 324; 106 S.Ct. 2548, 2553 (1986), the Supreme Court held:

> We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56( c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.

## II. OFFICER R.D. MOORE ACTED UNDER COLOR OF LAW.

An off-duty peace officer who observes a crime in progress immediately becomes an on-duty officer. *Laughlin v. Olszewski,* 102 F.3d 190, 192 n.1 (5th Cir.1996); *Villegas v. Griffin Indus.,* 975 S.W.2d 745, 754 (Tex.App. – Corpus Christi 1998, writ denied); *Wallace v, Moberly,* 947 S.W.2d 273, 277 (Tex.App. – Fort Worth 1997, no writ); *City of Dallas v. Half Price Books, Records, Magazines, Inc.,* 883 S.W.2d 374, 377 (Tex.App. – Dallas 1994, no writ). A police officer is not

relieved of his duty to prevent crime when he witnesses an illegal act simply because he is off-duty. *See Blackwell v. Harris County*, 909 S.W.2d 135, 139 (Tex.App. – Houston [14th Dist.] 1995, writ denied) (*citing Moore v. State*, 562 S.W.2d 484, 486 (Tex.Crim.App.1978)).

It is the nature of the act performed, not the clothing of the actor or even the status of being on-duty or off-duty, which determines whether an officer has acted under color of law for purposes of civil rights statutes. *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975). There Belcher, an off-duty officer, involved himself in an altercation in a bar. As a result he killed two people and paralyzed a third with a handgun assigned to him. Belcher contended that his actions were taken as a private citizen because he was engaged in private social activity, was out of uniform, off-duty, and never identified himself as a police officer at any time. However, the court held that while shooting the three men, Belcher was acting under the color of law because the police regulations required him to carry a gun at all times, and further, the police chief testified that the office regulations required an officer to take action in any type of police or criminal activity 24 hours a day. *Belcher*, 522 F.2d at 441. An off-duty police officer who performs an actual or apparent duty of his office is acting under the color of law. In *City of Dallas v. Half Price Books, Records, Magazines, Inc.*, 883 S.W.2d 374, 377 (Tex. App. – Dallas 1994, no writ), the court held that an off-duty police officer who observes a crime immediately becomes an on-duty police officer. An officer who is present at the scene of an arrest and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under civil right statutes. *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 (1st Cir. 1990), *cert. denied*, 500 U.S. 956.

In the present case officers are required, under the Departmental Directives of the Harlingen Police Department, (hereinafter referred to as "Directives" and attached hereto as Exhibit "B")[1], to

---

[1] The subsections of the directives quoted herein are attached hereto as Exhibit "B" and incorporated herein for all purposes.

swear to enforce federal and state laws, and local ordinances (Subsection 6.08.002).  They have the

following duties:

> (1)   to "protect and serve" the community by complying with their lawful duty to preserve the peace, protect life and property, and to deter and prevent crime while detecting and apprehending criminals (Subsection 6.07);
>
> (2)   to take action and report upon all violations coming to their attention, as well as all information they receive about any actual or suspected violation of the law (Subsection 6.07.001);
>
> (3)   to make arrests when necessary to enforce laws and to protect the public (Subsection 6.08); and
>
> (4)   to make appropriate arrests when witnessing or receiving information of violations of the law (Subsection 6.08.001).

The Directives instruct off-duty officers:

> (1)   to carry their badges and police identification with them (Subsection 4.05.001);
>
> (2)   to take proper police actions in matters coming to their attention (Subsection 4.01.005); and
>
> (3)   to report to the Police Department information of a law violation they received when practical.  If the situation requires immediate action, the officers take the proper action and make written reports (Subsection 4.05).

Therefore, under the Directives, Officer R.D. Moore is required to take police action to stop or

investigate criminal activity 24 hours a day regardless of whether he is on-duty or off-duty.

In the present case, Officer Moore should have at least suspected that his son, Ernest Moore,

had committed some crime long before Cameron County Deputy Rodriguez and Border Patrol

Officers Salinas and Rodriguez pulled into Officer Moore's driveway around 7:00 a.m. on July 7,

1998 -- the day of the incident in question -- based on the following facts:

> (1)   Patsy Moore, Officer Moore's wife, told the Department of Public Safety investigator that at approximately 6:00 a.m. of the day of the incident in question, she heard Ernest Moore's bedroom door slam open.  She looked for Ernest both in and outside the house.  When she opened Ernest's pickup truck door, ammunition fell out.  She then returned inside, woke up her husband Officer Moore, and told him that

something was wrong because Ernest's pickup was outside and the gun safe was open. Officer Moore went to Ernest's room and observed that the gun safe was opened and noticed that the AR-15 was missing. He then went outside and saw that Ernest's pickup was damaged. (Page 18 of Texas Department of Public Safety Investigation Report, Exhibit "C"); and

(2)     In his Affidavit, which is attached hereto as Exhibit "A," Lieutenant Jose Rubio Jr. stated under oath that:

> On July 14, 1998, Sergeant Foist submits an e-mail to Caliber Press in reference to the Border Patrol Shootings. The e-mail points is important because Foist makes it appear that Ernest Moore had a conversation with RD Moore and Ernest said, "I'm in deep shit now, Dad" as he headed out the door. RD Moore then notices the AR-15 is missing from the safe. . ..

Under the Directives mentioned, Officer Moore should have taken action to investigate what his son had done. Officer Moore should have, at the very least, detained his son for questioning. Instead, Officer Moore not only allowed his son to flee from his house, but in fact he assisted his son in his escape from arrest by the Cameron County authorities. In his affidavit, Officer Rubio stated (emphasis added):

> On Tuesday, July 7, 1998, I was on day shift and I was scheduled to instruct a class on Mental Health Education for Police Officers. My two shift supervisors were also scheduled to attend this class and Sergeant Miguel Garcia was to cover my shift for the day. As I was preparing to leave for the Harlingen Police Department, I received a phone call from Officer Matthew Manning around 7:15 a.m. informing me that RD Moore's son, Ernest, had just shot two Border Patrol officers and a sheriff's deputy. **He further informed me that Sgt. Foist and Sgt. Garcia had been called out to RD Moore's house in San Benito. . . . I was informed the reasons behind both Sergeant Foist and Sergeant Garcia being there at the scene were a request by the Cameron County Sheriff's Department. Apparently, RD Moore had denied permission to the Sheriff deputies to search the house for Ernest Moore and had been rude to them. . .**

Moreover, when Officer Moore discovered that the AR-15 rifle was missing from the gun safe, he should have pursued his son and particularly should have informed the deputies and Salinas and Rodriguez that his son had a deadly assault rifle. Instead, Officer Moore did neither. Officer Moore's failure to take proper police action against his son and his concealment of information from other officers at the scene were in direct violation of these Directives and clearly constituted actions under color of law.

### III. SPECIAL RELATIONSHIP

As the Court observed at the August 12th hearing, two exceptions have emerged in the case law which permit the bringing of a civil rights cause of action against a public entity for conduct by a private tort feasor. These two exceptions focus on the special relationship that may exist between the victim and the State actors and the State-created danger that resulted in the victim's injury.

In *Schuster v. City of New York*, 5 N.Y. 2d 75, 154 N.E. 2d 534, 180 N.Y.2d 265 (1958) the Plaintiff was killed while attempting to assist the police department in the apprehension of a suspected murderer. The Court recognized that a police officer owes a special duty to use reasonable care for the protection of persons who have collaborated with it in the arrest or prosecution of criminals. As the Plaintiffs have alleged in their amended complaint, the facts in the case at bar are analogous to *Schuster*.

In the instant case the Border Patrol Agents were a part of a coordinated, integrated law enforcement effort that involved city, county, and federal agencies. Exhibit "D" attached hereto is a Memorandum to Jose E. Garza, Chief Patrol Agent from Hector Gonzales, Supervisory Border Patrol Agent. As the memo indicates: "at approximately 6:41 a.m. the Cameron County Sheriff's Department contacted McAllen Sector's Communication Center and requested Air Operation's assistance in locating the suspect. LECA John Cantu contacted Harlingen Supervisory Border Patrol

First, it was foreseeable that a dangerous situation would present itself. Officer Moore had specific knowledge about his son that made it probable and highly likely that there was imminent and unreasonable danger to Decedents Salinas and Rodriguez:

(1) Officer Moore knew that his son was psychologically unstable, the recipient of prescription psychological drugs, and a cocaine user;

(2) Officer Moore knew that his son's bedroom was filled with Nazi paraphernalia;

(3) Officer Moore knew that his son had taken the AR-15 from the rifle safe before Decedents Salinas and Rodriguez were called for assistance;

(4) Officer Moore knew that given his son's racist beliefs, that Decedents Salinas and Rodriguez – both minority law enforcement officers who were called to assist in the arrest of Ernest Moore, would be targets; and

(5) Officer Moore failed to abide by the Directives of the Harlingen Police Department to protect the lives and property of Decedents Salinas and Rodriguez.

Second, the dangerous situation was the direct result of the state actors placing a dangerous instrumentality into the perpetrator's hands. This case involves a military assault weapon which was turned over to the state actors for destruction because of the nature of the weapon. The weapon had the capacity to fire numerous rounds in rapid succession at great distances with extreme accuracy. Unlike the standard issue police revolver, the AR-15 assault rifle presented a significant risk of danger for many individuals within a wide range of the user of the weapon. Also, unlike the typical officer revolver, this weapon was brought to the police department to be destroyed. The unique circumstances by which this specific weapon found its way into the hands of this particular perpetrator distinguishes this case from other instances involving shootings with police weapons. And more importantly the unique circumstances of this case involving an extremely dangerous

instrumentality that was within the control of the state actors distinguishes this case from *Saenz*. One must assume that the Fifth Circuit would have been less reticent to apply the state-created-danger line of cases to the *Saenz*' facts if the perpetrator in *Saenz* had been driving a state-owned vehicle.

Third, the victims in the case at bar were identifiable before the event occurred. As discussed above, the state actors had reason to know before the shooting that Border Patrol Agents would be assisting in the coordinated effort to apprehend the suspect. In addition, Ernest Moore was already known by his father, Officer R.D. Moore, and the Harlingen Police Department to be psychologically unstable, the recipient of prescription psychological drugs, and a cocaine user.[2]  It was also known that Ernest Moore's bedroom was filled with Neo-Nazi paraphernalia.

In his affidavit, Lieutenant Rubio testified:

> On [Monday, July 13, 1999], for the first time, I hear about the Neo-Nazi paraphernalia found inside the bedroom of Ernest Moore. This shocks me initially because I can't believe that a police officer would allow his son to have the Neo-Nazi paraphernalia.  Part of our law enforcement training under mandatory T.C.L.E.O.S.E. regulations covers culture diversity which addresses hate crimes and racist groups. The State of Texas governing body has made a tremendous effort to attempt to address the issues of hate crimes and racial prejudice to law enforcement officers by having a mandatory culture diversity class every two years. It would be against departmental policy for Officer Moore to condone the behavior of his son by allowing Ernest Moore to be involved in Neo-Nazi activities.

Officer Moore had to know that his son had the "Neo-Nazi mentality" of hatred against minorities since Ernest Moore lived with his father, and Officer Moore knew that the Neo-Nazi paraphernalia was in his son's room. Thus, Officer Moore should have known that minority law enforcement officers would be his son's first targets on the day of the incident in question since only law enforcement officers would, as a matter of fact, be present around the perimeter of his house to search for his son.

---

[2] Plaintiffs' First Amended Complaint, ¶22.

In light of Chief Jim Schoepner's close friendship with Officer Moore and the telephone conversation he had with Officer Moore at the critical moment before the tragic incident in question, Chief Schoepner also, in all reasonable probability, had to know that minority law enforcement officers would be Ernest Moore's first targets

After responding to the call and going to the scene, the U.S Border Patrol Agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas were entrapped and it was too late for them to back out because they were already under Ernest Moore's murderous eye.  This situation was created by the failure of Officer Moore and Chief Schoepner to fulfill their police duties under Subsection 6.07 of the Directives, which provides that:

> Officers "protect and serve" the community by complying with their lawful duty to, preserve the peace, protect life and property, and to deter and prevent crime while detecting and apprehending criminals.

Had the Defendants fulfilled their duty under the Directive quoted above by warning Salinas and Rodriguez about the imminently dangerous situation and having them seek cover, Officers Rodriguez and Salinas would not have been killed by Ernest Moore.  Therefore, Officer Moore and Chief Schoepner were responsible for the deaths of Officers Rodriguez and Salinas under civil right statutes. *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 202, 109 S.Ct. 998, 1005 (1989); *Schuster v. City of New York*, 5 N.Y.2d 75, 81, 154 N.E.2d 534, 537 (1958). This court can, and should, take judicial notice of the Nazi and Neo-Nazi mentality, the corresponding attitude of intensely despising minorities, and the predisposition of such "hate groups" to use violence to injure and kill minorities.

WHEREFORE, Plaintiffs respectfully request this Court to deny Defendants' Motions to Dismiss and allow Plaintiffs to proceed immediately with preparation for a speedy and just trial

Respectfully submitted,

BROADUS A. SPIVEY
SPIVEY & AINSWORTH, P.C.
48 East Avenue
Austin, TX  78701
512+474-6061
fax: 512+474-1605

Mr. Richard Pena
Mr. Michael Greenberg
Law Offices of Richard Pena, P.C.
Barton Oaks Plaza Two
901 MoPac, Suite 325
Austin, Texas 7746-5747

By _____
Broadus A. Spivey
State Bar No. 18955000

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the above and foregoing document was forwarded on August 24, 1999, to all counsel of record and interested parties via facsimile and U.S. mail:

Mr. Tom Lockhart
Mr. Jim Denison
Mr. Roger W. Hughes
ADAMS & GRAHAM, L.L.P.
222 E. Van Buren, West Tower
Harlingen, Texas 78551-1429
ATTORNEYS FOR DEFENDANT

Mr. Walter J. Passmore
PASSMORE, WALKER & TWENHAFEL, L.L.P.
2424 North 10th St, Suite 201
McAllen, Texas 78501
ATTORNEYS FOR DEFENDANT

_____
Broadus A. Spivey