43

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
ENTERED

APR 1 1 2000

Michael N. Milby, Clerk of Court
By Deputy Clerk

| | |
|---|---|
| Gilberto M. Rodriguez, et al, | § |
| | § |
| Plaintiffs, | § |
| | § |
| v. | §   CIVIL ACTION NO. B-98-163 |
| | § |
| City of Harlingen, et al, | § |
| | § |
| Defendants. | § |

## NUNC PRO TUNC ORDER

Inadvertencies in the order signed and entered in this case on March 31, 2000 [Dkt. No. 42], are hereby corrected by substituting therefor the following order as of April 11, 2000, nunc pro tunc.

BE IT REMEMBERED, that on March 30, 2000, the Court considered the Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) Based on Qualified Immunity [Dkt. No. 8] and Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) [Dkt. No. 7].   After considering the Plaintiffs' complaint, the Plaintiffs' Rule 7 reply, the Defendant's motions, arguments of counsel, and the Parties' various responses, replies and briefs, the Court makes the following rulings:

(1)   Defendant Moore and Scheopner's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) Based on Qualified Immunity [Dkt. No. 8] is **GRANTED**;

(2)   Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) [Dkt. No. 7] is:

(a)   **MOOT** as to the Plaintiffs' 42 U.S.C. § 1983 claims alleged against Defendants Moore and Scheopner because the Court has granted them qualified immunity;

1

(b)    **GRANTED** as to the special relationship and special danger claims alleged against the City of Harlingen, and **DENIED** as to the Plaintiffs' state-created danger claim against the city; and,

(c)    **DENIED** as to the Plaintiffs' Texas Tort Claims Act cause of action against the City of Harlingen.

I.    **Facts alleged by the Plaintiffs**[1]

The Plaintiffs are the husband, daughter and parents of Susan Lynn Rodriguez, a Border Patrol Agent, who was murdered on July 7, 1998 under tragic circumstances. Agent Rodriguez was fatally shot by Ernest Moore ("E. Moore") while she stood in front of the house in which E. Moore lived together with his father, R.D. Moore ("Defendant Moore"), a Harlingen Police Department Detective. The weapon used to kill Agent Rodriguez was an AR-15 semi-automatic assault rifle that Defendant Moore kept in a Remington gun safe in his son's bedroom.

A citizen delivered the AR-15 rifle to Defendant Moore at the Harlingen Police Department for destruction in 1995. However, the rifle was never destroyed, and instead the Chief of Police, Defendant Jim Scheopner ("Defendant Scheopner"), either directly issued the weapon to Defendant Moore, or allowed it to fall into his hands because there were no chain of custody procedures in place to document the receipt or issuance of weapons. Defendant Moore was allowed to keep the rifle although he was never trained on how to use or store it, and he had no duties that required the use of a weapon that could fire rounds in rapid succession at great distances and with extreme accuracy. He allegedly told a fellow police officer that "the AR-15 was his personal weapon" [Dkt. No. 38,

---

[1] These facts were excerpted from the Plaintiffs' complaint and Rule 7 reply. However, the Court did not consider the e-mail news article from Street Survival Newsline attached to the Plaintiffs' Rule 7 reply as Exhibit B. This type of document is not foreseen by Federal Rule of Civil Procedure 10(c) which states: "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." See Perkins v. Silverstein, 939 F.2d 463, 467 n.2 (7th Cir. 1991). The Plaintiffs' complaint and the body of the Rule 7 reply are not referenced in the description of the facts; however, the Court has indicated when it excerpted information from exhibits attached to the Plaintiffs' Rule 7 reply. In addition, the Court has disregarded the sections of the Plaintiffs' Rule 7 reply that contain legal arguments, instead of pleading facts.

Exhibit E, p.3]. Defendant Moore kept the rifle in his son's room and allowed his son to use the weapon for target practice although he knew E. Moore was psychologically unstable, used cocaine, decorated his bedroom with Neo-Nazi propaganda, and was taking Prozac.

Ernest Moore killed two people and seriously wounded a third at about 4:30 a.m. on July 7, 1998, allegedly because he was angry at two drug dealers for giving cocaine to his girlfriend. Witnesses indicated that E. Moore had been drinking excessively, and using cocaine and marijuana from 6:00 p.m. until 2:00 a.m. the evening before the shooting [Dkt. No. 38, Exhibit A, p.3]. E. Moore fled after his weapon was wrested away from him by a private citizen, and then drove home. At home, E. Moore spoke with Defendant Moore, took the AR-15 rifle that had been turned into the police department for destruction, and then left the house. Defendant Moore did not try to detain his son despite the fact that he later indicated that he knew that his son had almost certainly committed a crime.

At approximately 5:20 a.m. the Cameron County Sheriff's Department responded to a 911 call placed from the scene of the crime. Ernest Moore was identified as the suspect and a "Look Out" call was placed to all law enforcement agencies in the area. At approximately 5:31 a.m., Cameron County Sheriff's Deputy Robert Rodriguez located the suspect's vehicle parked at a residence. As Deputy Rodriguez approached the house to look for E. Moore, a man -- later identified as Defendant Moore -- stepped out of the garage and said: "I know my son did something, I want to know what." He further stated that he was missing weapons, and that he knew his son was on the verge of committing suicide or killing someone. Afterwards, at approximately 6:41 a.m., a coordinated law enforcement effort was put together and Border Patrol agents, including the decedent, were dispatched to the scene [Dkt. No. 38, Exhibit A, p.2]. Defendant Moore initially refused to allow law enforcement officers to search his house. However, after speaking to Defendant Scheopner and other Harlingen police officers on the telephone, he allowed sheriff's deputies, but not Border Patrol agents, to enter. Later, while Agent Rodriguez stood outside the Moore home speaking to other law enforcement officers, E. Moore opened fire with the AR-15 rifle. The decedent and another Border Patrol agent, Ricardo

CtrlPDF - www.twice.com

Guillermo Salinas, were killed, and a Sheriff's Deputy, Raul Rodriguez, was seriously injured.

The Plaintiffs allege that the City of Harlingen knew that there were serious deficiencies in Chief of Police Scheopner's administration of the police department before Agent Rodriguez' murder. Specifically, Defendant Scheopner purportedly allowed favored officers and friends, such as Defendant Moore, to circumvent and violate laws and departmental procedures. The Defendants were friends and had worked together for many years. However, the city did nothing to remedy the situation. Even after the incidents that form the basis of this lawsuit, little was done by the city, although Defendant Scheopner falsely informed the public that the Harlingen Police Department had a SWAT team, and that Defendant Moore possessed the weapon used to kill the decedent because he formed part of that team. Defendant Moore was never disciplined and Defendant Scheopner eventually resigned at Lieutenant's pay.

## II.   **Standard for Deciding a Motion to Dismiss**

When considering a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a district court must accept all well-pleaded facts as true, and construe them in favor of the plaintiff. See Conley v. Gibson, 335 U.S. 41, 45-46 (1957); Petta v. Rivera, 143 F.3d 895, 897 (5th Cir. 1998); McCartney v. First City Bank, 970 F.2d 45, 47 (5th Cir. 1992). The plaintiff is only required to plead sufficient information to outline the elements of his or her cause of action or to permit reasonable inferences to be drawn that these elements exist.[2]  See General Star Indemnity, Co. v. Vesta Fire Ins., Corp., 173 F.3d 946, 950 (5th Cir. 1999); Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994). See also 5 C. WRIGHT & C. MILLER, FEDERAL PRACTICE & PROCEDURE § 1216 (2d ed.1990). In other words, the complaint must simply provide the opposing party

---

[2]"A complaint need not outline all the elements of a claim. It must be possible, however, for an inference to be drawn that these elements exist." Walker v. South Central Bell Telephone Co., 904 F.2d 275, 277 (5thn Cir. 1990). However, the plaintiff cannot supplement the complaint with factual allegations contained outside the four corners of the pleadings in order to establish the elements of his or her claim. See McCartney v. First City Bank, 970 F.2d 45, 47 (1992).

CMPDF - www.texio.com

with fair notice of the plaintiff's claim and the grounds upon which it is based.  See Conley, 355 U.S. at 47.  The Supreme Court has stated, and the Fifth Circuit has repeatedly cited "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  Walker v. South Bell Central, 904 F.2d 275, 276 (5th Cir. 1990) (citing Conley, 355 U.S. at 45-46.).  See also Davis v. Monroe County Brd. of Education, 526 U.S. 629, --, 119 S.Ct. 1661, 1676 (1999); Shipp v. McMahon, 199 F.3d 256, 260 (5th Cir. 2000); Tuchman, 14 F.3d at 1067; Mahone v. Addicks Utility Dist. of Harris County, 836 F.2d 921, 926 (5th Cir. 1988).  Ambiguities or doubts regarding the sufficiency of the claim must be resolved in favor of the plaintiff in order "to do substantial justice."  Fed R. Civ. Pr. 8(f).  See Fernandez-Montes v. Allied Pilots Ass'n, 987 F.2d 278, 284 (5th Cir. 1993).

While the law disfavors motions to dismiss for failure to state a claim, there are of course situations in which a complaint should and must be dismissed.  See Mahone, 836 F.2d at 926; Clark v. Amoco Prod. Co., 794 F.2d 967, 970 (5th Cir. 1986).  The Court cannot allow a complaint to survive if it only alleges legal conclusions, or is devoid of any factual allegations.  See Fernandez-Montes, 987 F.2d at 284; Walker, 904 F.2d at 277. In addition, if the face of the complaint demonstrates that the plaintiff's claim is barred by an affirmative defense, or if no reasonable inference can be made on an element, the plaintiff cannot proceed.  See Blackburn v. City of Marshall, Tex., 42 F.3d 925, 931 (5th Cir. 1995).

The routine rules of notice pleading detailed above do not apply when a plaintiff sues a public official in their individual capacity under 42 U.S.C. § 1983, and the defendant asserts the affirmative defense of qualified immunity. Once an individual defendant claims immunity he or she may request that the court order the plaintiff to file a Federal Rule of Civil Procedure 7(a) reply that complies with a heightened pleading standard.  See Schultea v. Wood, 47 F.3d 1427, 1433 (5th Cir. 1995) (en banc).  In fact, in some situations, it may be reversible error to dismiss a case based on qualified immunity if a

5

Rule 7 reply is not ordered.[3]  See Reyes v. Sazan, 168 F.3d 158, 160-61 (5th Cir. 1999); Morrin v. Caire, 77 F.3d 116,121 (5th Cir. 1996); Todd v. Hawk, 72 F.3d 443, 446 (5th Cir. 1995); Schultea, 47 F.3d at 1436 n.1 (concurring opinion of Judge Emilio Garza).  Once a Rule 7 reply has been filed, it is considered part of the pleadings and the facts alleged therein may be considered in deciding a motion to dismiss.

III.  **Qualified immunity bars the Plaintiffs' claims against Defendants Detective R.D. Moore and Chief of Police Jim Scheopner**

A.  Sua sponte consideration of the individual Defendants' qualified immunity claims

The Defendants' motion on qualified immunity states that they "move to dismiss under Rule 12(b)(6) the claims against them individually based on qualified immunity; *alternatively*, they ask the Court to order the Plaintiffs to reply to their defense of qualified immunity pursuant to Fed.R.Civ.Pr. 7(a) (emphasis added)" [Dkt. No. 8, p.1].  By ordering the Plaintiffs to submit a Rule 7 reply that specifically responds to the Defendants' qualified immunity defense [Dkt. No. 36], the Court has granted the Defendants the relief requested.

However, while the Defendants' motion to dismiss is therefore no longer pending, the Court may consider dismissal of claims based on qualified immunity on its own initiative as long as the procedure employed is fair.  See 5A C. WRIGHT & C. MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 (2d ed. 1990).  See also First Gibraltar Bank, FSB v. Smith, 62 F.3d 133, 135 (5th Cir. 1995); Guthrie v. Tiffco, 941 F.2d 374, 379 (5th Cir. 1991); Shawnee International v. Hondo Drilling Co., 742 F.2d 234, 236 (5th Cir.1984); Coghlan III v. Aquasport Marine Corp., 73 F.Supp.2d 769 (S.D.Tex. 1999) (dismissing the plaintiff's claims sua sponte on grounds not included in the defendants' motion).  The Parties are not prejudiced by the Court's decision to make a sua sponte ruling on qualified immunity because the Plaintiffs have extensively and thoroughly responded to the Defendants' qualified immunity defense through several avenues: (1) the qualified immunity issue has been fully briefed through numerous responses, replies, and supplemental briefs; (2) the

---

[3] Whether a complaint is insufficiently particular, and, therefore, a Rule 7 reply is required is a question of law.  See Reyes v. Sazan, 168 F.3d 158, 160-61 (5th Cir. 1999).

6

Court heard oral argument on the issue; and, (3) the Plaintiffs amended their complaint and filed a Rule 7 reply after the Defendants filed their qualified immunity motion.

By first addressing whether Defendants Moore and Scheopner are entitled to qualified immunity, the Court preserves the policy behind the defense. "One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." Siegert v. Gilley, 500 U.S. 226, 232-33 (1991). The United States Supreme Court has "thus recognized an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question [of] whether the conduct of which the plaintiff complains violated clearly established law." Id. (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Although the first step of the qualified immunity analysis requires the Court to examine whether the Plaintiffs' causes of action fail to state a claim as a matter of law,[4] the Court can pretermit that issue and dismiss a claim based on the fact that the law is not clearly established. The Court can thereby avoid a situation in which the Defendants would be subject to additional and unnecessary burdens of litigation because a motion to dismiss is denied, and qualified immunity is then granted at a later date.

B.    Standard for deciding whether a Defendant is entitled to qualified immunity

The Court must decide three questions to rule on whether a particular defendant is entitled to qualified immunity in his or her individual capacity: (1) Has the plaintiff alleged a deprivation of a constitutional right?; (2) Was the constitutional right clearly established at the time of the alleged violation?; and, (3) Were the defendant's actions objectively unreasonable? See Kipps v. Caillier, 197 F.3d 765, 768 (5th Cir. 1999). If the answer to any of these questions is "No," the defendant is immune.

---

[4] See Duckett v. City of Cedar Park, Tex., 950 F.2d 272, 277 (5th Cir. 1992).

7

C.    Has the Plaintiff alleged a deprivation of a constitutional right?:

A court must identify the plaintiff's allegations with some precision to satisfy the general policy behind the qualified immunity defense: to hold officials liable for violating laws or case holdings that are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 639-40 (1987). "In some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary." U.S. v. Lanier, 520 U.S. 259, 270 (1997). If the plaintiffs' claims are based on a fact-specific exception to a general rule, and their claims are not identified in detail, they will almost always be sufficiently established to satisfy the second prong of the immunity test. This would defeat the purpose of engaging in the qualified immunity inquiry since the individual officers would never be immune.

In summary, the Plaintiffs allege that Defendants Moore and Scheopner's deliberately indifferent actions and omissions under color of state law violated the decedent's Fourteenth Amendment due process right to liberty and property.[5]  The Plaintiffs claim that Defendant Moore violated the decedent's due process rights by improperly accepting, storing, and securing a police department owned AR-15 assault rifle in his home, and, in doing so, failing to comply with police department policies and state law. Defendant Moore allowed his son access to the weapon although he knew that his son was psychologically unstable. He also infringed on the decedent's rights by failing to warn the decedent of the threat posed by his son or by failing to detain E. Moore despite

---

[5] The Plaintiffs' amended complaint states that their allegations are also based on the Fourth Amendment [Dkt. No. 16, par. 1]. However, at the Court's August 12, 1999 hearing, Plaintiffs stated that they are not asserting a Fourth Amendment claim against any of the Defendants. Plaintiffs additionally stated in their Response to Defendants' Motion to Dismiss and Supporting Brief [Dkt. No. 23] that they are not asserting an Eighth Amendment excessive force claim. In an abundance of caution, the Court ordered the Plaintiffs to clarify this statement [Dkt. No. 37] to assure that the Plaintiffs do not mean to assert a Fourth or Eighth Amendment claim. The Plaintiffs responded by stating that "they are not asserting any cause of action for the use of excessive force under either the Fourth or Eighth Amendments" [Plaintiff Rodriguez' Response to Court Order Dated March 2, 2000, filed March 6, 2000]. In addition, the numerous responses and briefs filed by the Plaintiffs only address the Plaintiffs' claims under the Fourteenth Amendment.

knowledge that he had most probably committed a crime, had taken the AR-15 assault rifle, and was hiding nearby.

The Plaintiffs allege that Defendant Scheopner is liable under the Fourteenth Amendment for failing to create or enforce proper policies that would have prevented Defendant Moore's actions and omissions, and failing to warn the decedent of the danger presented by E. Moore or preventing E. Moore from shooting her. Defendant Scheopner directly or indirectly issued the assault rifle to Defendant Moore and allowed him to keep it when he knew that Moore was not trained in the appropriate handling and storage of the weapon, and performed no duties that required its use. He failed to create adequate departmental policies or to enforce existing policies that required Defendant Moore to store the weapon outside of his home in an adequately secure location. The Plaintiffs allege that after the fact, Defendant Scheopner ratified Defendant Moore's actions by declining to discipline Moore, and by attempting to cover up his failure to enforce or create policies that would have prevented the weapon from falling into the killer's hands. After the incident, Defendant Scheopner falsely stated that Defendant Moore was assigned to a non-existent SWAT team that required possession of the AR-15 rifle.

All of the Plaintiffs' claims against Defendants Moore and Scheopner in their individual capacity focus on the fact that the Defendants contributed to creating a dangerous situation by allowing a private actor, E. Moore, to gain possession of the AR-15 semi-automatic rifle, and failed to protect the decedent by warning her of the danger or preventing it. The Due Process Clause generally, however, serves only to limit state action. In most circumstances, it does not require the state to protect the public against private actors or provide governmental aid. See DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 195-96 (1989). In Deshaney, a father abused his child and ultimately beat him so severely that he suffered permanent brain damage. Child Protective Services received several complaints regarding the abuse and even removed and then returned the child to the father's home. However, the agency ultimately allowed the child to remain in his father's custody. Id. at 191-93. The Supreme Court affirmed the appellate decision to dismiss the case because the Plaintiff had failed

9

to state a substantive due process claim.[6]  Id. at 203.  The Deshaney court held that the state only has a duty to protect those persons with whom it has a "special relationship" by taking them into its custody and holding them against their will.  Id. at 199-200.  The Court also implied through dicta that the state may possibly owe a duty to protect if it creates a danger and then does nothing to protect the plaintiff from that danger.   Id. at 201.  The Plaintiffs argue that their claims fall under the special relationship exception recognized by the Deshaney court, and two additional exceptions that have developed out of the Court's dicta on dangers generated by state actors: the state-created danger exception and the special danger exception.

### 1.    The special relationship exception

The special relationship exception to the Deshaney rule is well established.  The Supreme Court has repeatedly held that persons such as arrestees and involuntarily committed mental patients have a special relationship with the state that requires it to provide them with protection and to satisfy their basic human needs.  See e.g. City of Revere v. Massachusetts Gen Hosp., 463 U.S. 239, 244 (1983) (requiring medical care for suspects in police custody); Youngberg v. Romeo, 457 U.S. 307, 315-16 (1982) (holding that involuntarily committed psychiatric patients have a substantive due process right to safe conditions of confinement and freedom from unreasonable bodily restraints).  The special relationship exception has been limited, however, to persons functionally or actually in state custody.  The Fifth Circuit has clearly stated that those persons who are not involuntarily confined cannot state a substantive due process claim for the state's failure to protect them.[7]  See Walton v. Alexander, 44 F.3d 1297, 1301-04 (5th Cir. 1995).  In the

---

[6] The Fifth Circuit has repeatedly cited Deshaney in support of the general rule that a state actor does not violate the Constitution when he or she fails to prevent a private individual from harming a third party. See e.g. Saenz v. Heldenfels, 183 F.3d 389, 390 (5th Cir. 1999); Randolph v. Cervantes, 130 F.3d 727, 729 (5th Cir. 1997); Doe v. Hillsboro Indep. Sch. Dist., 113 F.3d 1412, 1414 (5th Cir. 1997); Walton v. Alexander, 44 F.3d 1297, 1302 (5th Cir. 1995).

[7] In Randolph, the Fifth Circuit rejected the due process claim of the mother of an out-patient of a state mental health center who killed herself while living in a state-owned apartment. See 130 F.3d at 730.  Several decisions have also dismissed the claims of students by stating that "[t]he restriction imposed by attendance laws upon students and their parents are not analogous

10

Fifth Circuit case most factually analogous to the case before this Court, the circuit held that prison guards injured by inmates during an escape attempt were free to quit their jobs and therefore were not involuntarily confined. Accordingly, they could not recover under the special relationship exception. See de Jesus Benavides v. Santos, 883 F.2d 385, 387 (5th Cir. 1980). This case is factually similar to de Jesus Benavides. Id. While the decedent may have had a duty to respond to a call for assistance in her capacity as a law enforcement officer, she was in no way physically or involuntarily confined by the state. While it sounds callous and highly unlikely, as in de Jesus Benavides, the decedent was free to quit her job instead of responding to the call. When all facts are construed in the Plaintiffs' favor, they cannot succeed on their claim that the state had a special relationship with the decedent and that it therefore had a constitutional duty to protect her under the Fourteenth Amendment Due Process Clause.

## 2. The state-created danger exception

The Plaintiffs allege that the Defendants violated the state-created danger exception to the general DeShaney rule that the government has no constitutional duty to protect the public. The state-created danger exception developed out of the Supreme Court's comment in Deshaney that "[w]hile the state may have been aware of the dangers [the plaintiff] faced, it played no part in their creation, nor did it do anything to render him more vulnerable to them." 489 U.S. at 201. It is not clear whether the Fifth Circuit has recognized the state-created danger exception. Several appellate cases include language that indicates that the Fifth Circuit would adopt the exception if it were presented with an adequate factual scenario, but that every case it has considered so far has fallen short of the mark.[8] Despite this uncertainty, for purposes of identifying whether the Plaintiffs have alleged a deprivation of a constitutional right, the Court will assume without deciding that

_____

to the restraints of prisons and mental institutions." Hillsboro Indep. Sch. Dist., 113 F.3d at 1414. See accord Walton, 44 F.3d at 1305; Johnson v. Dallas Indep. Sch. Dist., 38 F.3d 198, 202-03 (5th Cir. 1994); Lefall v. Dallas Indep. School Dist., 28 F.3d 521, 529 (5th Cir. 1994).

[8] See e.g. Saenz, 183 F.3d at 391-92; Randolph, 130 F.3d at 731; Hillsboro Indep. Sch. Dist., 113 F.3d at 1415; Salas v. Carpenter, 980 F.2d 299, 306-09 (5th Cir. 1995); Johnson, 38 F.3d at 200-02; Lefall, 28 F.3d at 530-31.

11

the Fifth Circuit would recognize the state-created danger exception given the facts of this case.

### 3. The special danger exception

The Plaintiffs allege that the decedent's rights were violated under a third exception to the Deshaney rule -- the special danger exception. The Plaintiffs argue that "a duty may exist on the state's part under § 1983 when the state was aware that the plaintiff faced a special danger that the general public did not face" [Dkt. No. 23, p.6]. This Court can find no law to support such an exception. No Fifth Circuit case mentions this exception, and the cases cited by the Plaintiffs from other circuits have either been overruled or discuss only the special relationship or state-created danger exceptions.[9] Therefore, the Plaintiffs' claim based on the special danger exception fails as a matter of law.

In conclusion, the Plaintiffs' allegations based on the special relationship and special danger exceptions to the Deshaney rule fail to state a claim as a matter of law. Hence, they fail the first prong of the qualified immunity inquiry, and the individual Defendants, Defendant Moore and Defendant Scheopner, cannot be held liable under those theories. The Court has assumed, for purposes of the qualified immunity analysis, that the Plaintiffs can state a claim based on the state-created danger exception. Therefore, that cause of action is the only one that will be analyzed under the second prong of the qualified immunity test. The second prong examines whether the constitutional right alleged by the plaintiffs was clearly established at the time the defendant performed the actions or omissions that form the basis of the plaintiffs' claims.

---

[9] The Plaintiffs cite three cases in support of their special danger claim. The first case, Bowers v. DeVito, relies on the state-created danger exception and makes no mention of a special danger exception. See 686 F.2d 616, 618 (7th Cir. 1982). In fact, Bowers has been cited by the Fifth Circuit as a state-created danger case. See Salas, 980 F.2d at 309 n. 8. The second case cited by the Plaintiffs, Jones v. Phyfer, is a "special relationship" case and only mentions the words "special danger" in passing. See 761 F.2d 642, 644 (11th Cir. 1985). Finally, the third case, Cornelius v. Town of Highland Lake, Ala., does hold that there is a "special danger" exception to the DeShaney rule, but the case was overruled in the context of employment relationships. See 880 F.2d 348, 353 (11th Cir. 1989), overruling recognized by White v. Lemacks, 183 F.3d 1253, 1258 (11th Cir. 1999).

D.    Was the state-created danger exception clearly established at the time of the alleged violation?:

The Fifth Circuit has held that a court should first look to United States Supreme Court and Fifth Circuit case law to determine whether a legal principle is clearly established, and therefore satisfies the second prong of the qualified immunity test. See Brady v. Fort Bend County, 58 F.3d 173, 175-76 (5th Cir.1995); Boddie v. City of Columbus, Mississippi, 989 F.2d 745, 748 (5th Cir.1993). If the Court finds that a principle is not clearly established by binding precedent, it may look to the law of other circuits, although Fifth Circuit and Supreme Court cases must provide primary guidance. See Doe v. State of La., 2 F.3d 1412, 1416 n.8 (5th Cir. 1993).[10]

For a principle to be "clearly established", one need not identify a case with exactly the same facts.  The unlawfulness of the defendants' actions must simply be apparent in light of preexisting law. See Anderson, 483 U.S. at 639-40; Alton v. Hopgood, 994 F.Supp 827, 835 n.5 (S.D. Tex. 1998); Hicks v. Bexar County, 973 F.Supp 653, 673-74 (W.D. Tex. 1997).   In other words, "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" Lanier, 520 U.S. at 270 (citing Anderson, 483 U.S. at 640).  The fact that there is no case on point can simply indicate the degree to which a legal issue is ingrained in our constitutional thinking. Id. at 271 (quoting United States v. Lanier, 73 F.3d 1380, 1410 (6th Cir. 1996) (Daughtrey dissenting)) ("[t]he easiest cases don't even arise. There has never been . . . a section 1983 case accusing welfare officials of selling foster children into

---

[10] "Relying solely on Fifth Circuit and Supreme Court cases, for example, would be excessively formalistic, but they will loom largest in our inquiries. In determining what the relevant law is, then, a court must necessarily exercise some discretion in determining the relevance of particular law under the facts and circumstances of each case, looking at such factors as the overall weight of authority, and the status of the courts that render substantively relevant decisions, as well as the jurisdiction of the courts that render substantively relevant decisions." Id.

slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability.").

The Plaintiffs' claim under the state-created danger exception to the <u>DeShaney</u> rule is the only allegation that survived the first prong of the qualified immunity analysis. However, it fails to pass muster at this point because it has not been directly addressed by the Supreme Court, is not clearly established law in the Fifth Circuit, and is not definitively recognized by a clear majority of circuits. The most recent Fifth Circuit case to discuss the state-created danger exception illustrates the precarious status of the exception in this circuit. In <u>Saenz v. Heldenfels</u>, the court affirmed the lower court's decision to dismiss the Plaintiffs' case. <u>See</u> 183 F.3d 389, 392 (5th Cir. 1999). In doing so, it stated that "[o]ther than the factually inapplicable state-created danger cases cited above – which reflect a theory that this court has not yet accepted" the plaintiffs cite no law that supports their claims. <u>Id</u>. This language plainly indicates that the state-created danger exception is not clearly established law in the Fifth Circuit.

The state-created danger exception has been construed narrowly by most courts because the Supreme Court has repeatedly communicated its extreme reluctance to extend new rights through the substantive component of the Due Process Clause. "As we have said many times, [the Due Process Clause] does not transform every tort committed by a state actor into a constitutional violation." <u>Deshaney</u>, 489 U.S. at 202. While the <u>DeShaney</u> decision arguably left the door open for the exception, it did not expressly recognize it. <u>See</u> <u>e.g.</u> <u>Washington v. Glucksberg</u>, 521 U.S. 702, 720 (1997); <u>Collins v. City of Harker Heights, Texas</u>, 503 U.S. 115, 125 (1992). Therefore, it is not clear whether the Supreme Court would embrace the state-created danger exception, if it were to grant certiori and address the issue directly.

In addition, the exception has been recognized as clearly established law by only about half of the federal court of appeals. The First Circuit has most aptly described the status of the state-created danger exception as a developing, yet uncertain and extremely fact-specific doctrine. "We cannot extract a clearly established right from a somewhat confusing body of caselaw through the use of hindsight, or permit claims of qualified

14

immunity to turn on the eventual outcome of a hitherto problematic constitutional analysis. The history of the state-created danger theory . . . is an uneven one. The distinction between affirmatively rendering citizens more vulnerable to harm and simply failing to protect them has been blurred. Moreover, courts have sometimes found that a given action, while rendering the plaintiff more vulnerable to danger, did not amount to a constitutional violation, but instead should be viewed as a state law tort." Soto v. Flores, 103 F.3d 1056 (1st Cir. 1997) (citations omitted).[11] Therefore, there is no external reason to disturb the Fifth Circuit cases that hold that the state-created danger exception is not clearly established. See e.g. Saenz, 183 F.3d at 392.

In conclusion, Defendants Moore and Scheopner are immune in their individual capacities from all of the Plaintiffs' federal claims based on the exceptions to the general rule that the government has no constitutional duty to protect the public against private

---

[11] The Third, Fourth, Fifth, Eighth and Eleventh Circuits have not recognized the state-created danger exception as clearly established law under any set of facts. The Third Circuit, in Mark v. Borough of Hatboro, held that it had not yet definitively decided whether the state-created danger theory is viable. See 51 F.3d 1137, 1151-52 (3rd Cir. 1994). The Fourth Circuit, in Pinder v. Johnson, recognized that given adequate facts a plaintiff may be able to state a state-created danger claim, but held that the law was not clearly established. See 54 F.3d 1169, 1176-77 (4th Cir. 1995). The Eighth Circuit, in Freeman v. Ferguson, similarly recognized that a plaintiff may be able to allege a tenable state-created danger claim, but stated that it is not clear how large a role the state must play in creating a danger before it is constitutionally responsible. See 911 F.2d 52, 54-55 (8th Cir. 1990). The Eleventh Circuit, in Powell v. Georgia Dept. of Human Resources, simply assumed for purposes of the case that a state-created danger cause of action existed and has not decided the issue. See 114 F.3d 1074, 1079 (11th Cir. 1997).

The Second, Sixth, Seventh, Ninth and Tenth Circuits, on the other hand, have held that some form of the state-created danger exception is clearly established law. The Second Circuit has recognized the state-created danger exception in situations in which state officials conspire with private actors to allow the private actors to harm a third person. See Estate of Rosenbaum v. City of New York, 975 F.Supp. 206, 220 (E.D.NY 1997) (holding that the state-created danger exception became clearly established in the Second Circuit after Dwares v. City of New York, 985 F.2d 94, 99 (2nd Cir. 1993)). The Sixth Circuit has held officials liable under the state created danger exception for releasing information from the files of undercover police officers. See Kallstrom v. City of Columbus, 136 F.3d 1055, 1067 (6th Cir. 1998). The Seventh Circuit, has held defendants liable under similar facts. See Monfils v. Taylor, 165 F.3d 511, 518 (7th Cir. 1998). In Wood v. Ostrander, the Ninth Circuit held officials responsible for impounding the plaintiff's car and leaving her stranded in a high crime area where she was raped. See 879 F.2d 583, 589-90 (9th Cir.1989). The Tenth Circuit, in Armijo By and Through Chavez v. Wagon Mound Public Schools, held that the exception is well-established. See 159 F.3d 1253, 1262.

actors or to provide aid, because the Plaintiffs' claims either fail to state a claim as a matter of law or are not clearly established law. The decedent did not have a special relationship with the state analogous to that of persons in custody, and, therefore, the Plaintiffs cannot recover under that exception as a matter of law. The special danger exception, on the other hand, simply does not exist. Finally, the state-created danger exception to the general rule that the state has no duty to protect the public under the substantive component of the Due Process Clause of the Fourteenth Amendment is not clearly established in the Fifth Circuit.

IV. **The Defendants' motion to dismiss is granted as to the Plaintiffs' special relationship and special danger claims alleged against the City of Harlingen, and denied as to the Plaintiffs' state-created danger claim against the city**

A. Aspects of the Defendants' motion that are moot or have already been addressed in other parts of this order

The Defendants move to dismiss all of the Plaintiffs' claims on the merits for failure to state a claim as a matter of law [Dkt. No. 7]. Since Defendants Moore and Scheopner have been granted qualified immunity, the motion is moot as to all federal claims alleged against them in their individual capacities. In addition, the Court ruled that the Plaintiffs' claims under the special relationship and special danger exceptions to the DeShaney rule failed the first prong of the qualified immunity analysis because they failed to state a claim as a matter of law[12] on the basis that the special danger exception does not exist, and that the decedent did not have a special relationship with the state. See supra §§ III(C)(1), III(C)(3). Therefore, without further discussion, the Court grants the Defendants' motion as to the Plaintiffs' claims against the City of Harlingen based on the special danger and special relationship exceptions. The Court must consider in greater detail, however, the Defendants' attack on the Plaintiffs' state-created danger claim against the city of Harlingen and the city's liability under the Texas Tort Claims Act.

---

[12] The first prong of the qualified immunity test essentially requires the Court to apply motion to dismiss standards. See Duckett, 950 F.2d at 277 (5th Cir. 1992).

16

B.     Standard for deciding a motion to dismiss a 42 U.S.C. § 1983 claim based on a
       novel legal theory

The Court detailed the standard to be applied in deciding a motion to dismiss for
failure to state a claim in Section II of this order.  However, it merits mention that the United
States Supreme Court has held that a plaintiff is not required to satisfy a heightened
pleading standard when it alleges a civil rights claim against a government body under 42
U.S.C. § 1983.  See Leatherman v. Tarrant County, 507 U.S. 163, 168 (1993).  Contrary
to the heightened pleading requirement imposed when an individual defendant asserts a
qualified immunity defense, a plaintiff suing a city must only satisfy the notice pleading
principles set out in Federal Rule of Civil Procedure 8(a).

The state-created danger exception to the general rule that the state has no duty
to protect is a fact-specific and novel legal theory that has not been fully developed in the
Fifth Circuit.  See supra § III(D). When a plaintiff asserts a novel legal theory a court
"should be especially reluctant to dismiss on the basis of the pleadings . . . since it is
important that new legal theories be explored and assayed in the light of actual facts rather
than a pleader's suppositions."  5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL
PRACTICE AND PROCEDURE § 1357 (2d ed. 1990).  See Sosa v. Coleman, 646 F.2d 991, 993
(5th Cir. 1981); Shull v. Pilot Life Ins. Co., 313 F.2d 445, 447 (5th Cir. 1963).  See also
Baker v. Cuomo, 58 F3d 814, 818-19 (2d Cir. 1995).  The Court will examine the legal
sufficiency of the Plaintiffs' allegations in light of this admonition.

C.     Governmental liability under 42 U.S.C. § 1983 and the state-created danger
       exception

To state a civil rights claim against a city under 42 U.S.C. § 1983, a plaintiff must
demonstrate that he or she has been deprived of a right secured by the Constitution or
federal law, and that the deprivation was caused by an official policy, practice or custom
of the city.[13]  See Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397,

_____

[13] The Plaintiffs repeatedly refer to the Defendants' violation of state law and internal police
department rules and procedures in support of their federal claims.  To hold a city or any defendant

17

403 (1997). In addition, when alleging a substantive due process claim, the plaintiff must show that the city's actions were "so egregious, so outrageous, that [they] may fairly be said to shock the conscience." See County of Sacramento v. Lewis, 522 U.S. 833, 847 n.8 (1998); Morris v. Dearborne, 181 F.3d 657, 668 (5th Cir. 1999).

The Plaintiffs have alleged that the decedent's constitutional rights were violated under the state-created danger exception.   As explained supra, the Fifth Circuit has not explicitly adopted the exception, but has indicated that it would accept the theory if it were presented with adequate facts. See supra § III(C)(2). In Randolph v. Cervantes, the Fifth Circuit outlined the elements required to state a claim under the exception:

   (1)   the environment created by the state actors must be dangerous;

   (2)   the state actors must know that it is dangerous;

   (3)   the state actors must have used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur; and,

   (4)   the state must have effectively stripped a person of her ability to defend herself, or cut off potential sources of private aid.  See 130 F.3d at 731 (citing Johnson, 38 F.3d at 201.).

Successful application of the exception has typically occurred where a state official has made an individualized decision assisting or creating a danger to an individual.  In addition, persuasive fact scenarios involve clear causation between the officials' decisions and the resultant harm. In Wood v. Ostrander, the Ninth Circuit reversed the district court's grant of summary judgment because it held that a state trooper who stranded the female plaintiff in a high crime area -- where she was later raped by a man who gave her a ride -- had acted with deliberate indifference in creating a specific danger.  See 879 F.2d 583, 589-90 (9th Cir. 1989).  In contrast, the plaintiff's case was dismissed in Callis v. Sellars, because the court held that even if the Fifth Circuit were to accept the state-created danger exception, the plaintiff's claims could not survive. See 931 F.Supp. 504, 520 (S.D. Tex.

---

liable under § 1983, a plaintiff must show that the defendant violated a federal right.  Therefore, violations of state law are not relevant unless they rise to the level of a constitutional or federal violation.  See Meyers v. Klevenhagen, 97 F.3d 91, 94 (5th Cir. 1996).

1996). In that case, the plaintiff voluntarily participated in a sting operation, at least in part, because a police officer had sexually assaulted and harassed her, and she was afraid that the officer would threaten or hurt her in the future. Id. Therefore, when the officer assaulted the plaintiff before an arrest was made, the plaintiff did not face a more dangerous position than she otherwise would have faced independent of the operation. Id. In addition, by participating in the operation, the plaintiff was partially responsible for creating the danger to which she was exposed. Id.

The state-created danger exception does not require a city to provide a safe workplace. In fact, the Supreme Court has explicitly held that the failure to warn a governmental employee of dangers inherent in his or her job or to provide adequate training to create a safe work environment is not actionable under § 1983. "The Due Process Clause does not impose an independent federal obligation upon municipalities to provide certain minimal levels of safety and security in the workplace." Collins, 503 U.S. at 130. See Rutherford v. City of Newport News, Va., 919 F.Supp. 885, 895 (E.D. Va. 1996). Instead, such claims are more properly characterized as state law torts. See Collins, 503 U.S. at 128. Therefore, in Collins, the Court denied relief to a the widow of a sanitation department worker who died of asphyxia after entering a manhole. In contrast, the state-created danger exception does address constitutionally actionable conduct; its elements go beyond a simple failure to secure safety, they involve affirmative acts that allow a known danger to run free. Government employees do not lose their constitutional rights once they agree to work for the state. Id. at 120.

For a city to be held liable under the state-created danger exception, the plaintiff must prove that the elements of the cause of action were violated as a result of an official policy, practice, or custom of that governmental body's policymakers. 42 U.S.C. § 1983 (West 1999). See Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 403 (1997); Palmer v. City of San Antonio, Texas, 810 F.2d 514, 516 (5th Cir. 1987) abrogated on other grounds, Leatherman, 507 U.S. 163, 168 (1993). "Although occasionally referred to as if they were three distinct creatures, a local governmental entity's official 'policies,' 'practices,' and 'customs' are really three different terms for those

19

actions which sufficiently bear the imprimatur of a governmental entity's final policymakers to justify holding the governmental entity responsible therefor." Hicks, 973 F.Supp. at 677. In other words, requiring proof of a municipal policy ensures that a city is held liable for its own wrongs, instead of imposing respondeat superior liability for the actions of a governmental employee.  See City of Canton v. Harris, 489 U.S. 378, 385 (1989).

A city policy, custom or practice can be created through several means.  Under § 1983, a city can be held liable for its officially promulgated rules, or the single act of a final policymaker designated as such under state law.  See City of St. Louis v. Praprotnik, 485 U.S. 112, 122-23 (1988); Pembaur v. Cincinnati, 475 U.S. 469, 478-79 (1986).  In addition, liability can be premised on a persistent, widespread practice of officials or employees which is not officially adopted, but is so common that actual or constructive knowledge can be attributed to final policymakers.  See Esteves v. Brock, 106 F.3d 674, 677 (5th Cir. 1997).

The city's action or inaction must have proximately caused the violation of the plaintiff's federal rights.  See Martinez v. California, 444 U.S. 277, 285 (1980).  Proof that the city caused a constitutional injury is essential because a municipal policy need not be inherently unconstitutional to create a constitutional injury.  See Collins, 503 U.S. at 123-24.  As indicated above, causation is especially important in the context of state-created danger exception cases, where frequently it is difficult to identify to what extent the danger faced by the plaintiff was caused by the state versus a private actor.

D.     The Plaintiffs' state-created danger allegations against the City of Harlingen are sufficient to survive the Defendants' motion to dismiss

The Plaintiffs allege that the City of Harlingen violated the decedent's Fourteenth Amendment due process right to liberty and property by creating a dangerous environment that provided an opportunity -- that otherwise would not have existed -- for E. Moore to murder Agent Rodriguez.  The city, through its final policymaker, Defendant Scheopner,

most probably knew of the danger posed by E. Moore, but did not warn the decedent.[14]
By withholding information, the city effectively stripped the decedent of her ability to defend
herself. These actions and omissions were brought about by the following city policies,
customs or practices:

(1)     Final policymakers had the power to remove Defendant Scheopner, but did
        not do so despite serious deficiencies in the operation of the police
        department that were apparent before Agent Rodriguez" murder;

(2)     The city maintained unconstitutional policies and failed to enforce existing
        procedures, thereby allowing Defendant Moore to take possession of the AR-
        15 assault rifle despite the fact that he was not trained to safely use or store
        it, and did not perform any duties that required the use of such a powerful
        weapon;

(3)     The city failed to discipline Defendant Moore for allowing his unstable son
        access to a police department weapon; and,

(4)     The city's final policymaker, Defendant Scheopner, failed to warn the
        decedent of the danger posed by E. Moore despite the fact that he almost
        certainly knew that E. Moore had killed two people, possessed an automatic
        rifle, was extremely dangerous and was hiding nearby.

This case is distinguishable from past state-created danger cases that concluded
that the plaintiff voluntarily placed herself in a precarious situation because of the nature
of her employment or actions. While employment as a law enforcement officer carries
inherent dangers, the Plaintiffs have pled facts that indicate that the particular predicament
faced by the decedent was not one normally faced by a Border Patrol agent. The policies
of the City of Harlingen allowed a civilian version of a military assault rifle to fall into the
hands of a person who was not a police officer and who was extremely dangerous. It is
reasonable to infer that E. Moore would not have been able to cause the death of the

---

[14] Plaintiffs allege that "Harlingen Police Chief Jim Scheopner had final authority to make
and establish policy governing the operation of the City of Harlingen Police Department, and the
conduct of its officers and personnel" [Dkt. No. 16, p. 5, ¶ 11].

decedent with a less powerful weapon and that a military style rifle would not have been available to E. Moore if Defendant Moore had not kept one in his home. In addition, one can reasonable infer that the police department's final policymaker, Defendant Scheopner, knew that E. Moore posed a real threat to the decedent. Given that Defendant Moore told the first person who walked up to his house that his son was on the verge of killing himself or a third person, had taken his father's missing weapon and had committed a prior crime, it would be reasonable to infer that he conveyed the same information to Defendant Scheopner, a long-time friend, in the telephone conversation they had before the decedent was killed. If Defendant Scheopner knew of the real threat posed by E. Moore before the decedent was killed, he could have avoided the danger he created by warning the law enforcement team surrounding the house to take necessary precautions to secure their safety. It is common sense that the decedent would have proceeded very differently if she had known that E. Moore was close by, carrying an assault rifle, and homicidal. Without information on the suspect's location, weapon and state of mind, the decedent had no reason to take special steps such as donning protective gear or staying out of open areas. The decedent was effectively stripped of the ability to defend herself, and became an easy target. If Defendant Scheopner had the ability to warn the decedent of the very real danger created by his own policies and procedures, and did not, his actions were outrageous and shock the conscience.

Based on the liberal notice pleading requirements of the Federal Rules of Civil Procedure and the general reluctance to dismiss novel legal claims at the pleadings stage, the Court finds that the Plaintiffs assert a colorable state-created danger claim against the City of Harlingen. The Plaintiffs plead sufficient facts to allow the Court to outline the elements of their claim, or reach reasonable inferences that the elements exist. Given that the city extensively briefed its opposition to the Plaintiffs' state-created danger claim, it cannot reasonably contend that it has not received fair notice of the grounds upon which the claim is based.

V.   **The Plaintiffs' Tort Claims Act cause of action against the City of Harlingen survives the Defendants' motion to dismiss**

The Plaintiffs assert that the City of Harlingen is liable under the Texas Tort Claims Act for Defendant Moore and Defendant Scheopner's negligent and wrongful use of the AR-15 rifle in the scope of their employment.  Tex.Civ.Prac. & Rem.Code Ann. § 101.021 (Vernon 1986).  The Tort Claims Act states that "[a] governmental unit in the state is liable for . . . personal injury and death proximately caused by the wrongful act or omission of the negligence of an employee acting within his scope of employment if . . . personal injury and death so caused by a condition or use of tangible personal or real property if the government unit would, were it a private person, be liable to the claimant according to Texas law."  Id.  "To state a claim under the Tort Claims Act based upon the use or misuse of non-defective tangible personal property, a plaintiff must allege (1) that the property was used or misused by a governmental employee acting within the scope of his or her employment and (2) that the use or misuse of the property was a contributing factor to the injury.  The negligence of the government employee must be the proximate cause of the injury and must involve a condition or use of tangible personal property under circumstances where there would be private liability."   Gonzales v. City of El Paso, 978 S.W.2d 619, 623 (Tex.App. -- El Paso 1998) (citations omitted).

The Defendants assert that Plaintiffs cannot recover under the Texas Tort Claims Act, because their cause of action is based on E. Moore's use of the rifle without Defendant Moore's permission, and that there is no case law that permits liability premised on a government employee's failure to prevent a third party from using a weapon without permission.  In addition, the Defendants claim that the Plaintiff cannot state a claim based on negligent entrustment. See Kennedy v. Baird, 682 S.W.2d 377, 388 (Tex.App. -- El Paso 1984); Prather v. Brandt, 981 S.W.2d 801, 806 (Tex.App. -- Houston [1st Dist.] 1998).

The Defendants' attack on the Plaintiffs' Texas Tort Claims Act cause of action is misguided.  The Plaintiffs state a viable claim against the City of Harlingen based on the individual Defendants' negligent storage of the weapon and their negligent entrustment of the firearm.  Therefore, the Defendants' motion to dismiss is denied.

23

The individual Defendants had a duty to properly store and safeguard a highly dangerous instrumentality. The Plaintiffs allege that their failure to do so proximately caused the decedent's death. While tort law generally imposes no duty to control the acts of a third party, the Plaintiffs' claim is not based on E. Moore's acts. Instead, it is founded on the Defendants' own negligence. See e.g. Smith v. Koenning, 398 S.W.2d 411, 415 (Tex.App. -- Corpus Christi 1966).

In addition, the Plaintiffs may be able to succeed on a claim based on Defendant Scheopner's negligent entrustment of the firearm to Defendant Moore, or Defendant Moore's entrustment of the weapon to E. Moore. The elements of negligent entrustment are that: (1) the entrustee was incompetent or unfit; (2) the entrustor knew of entrustee's proclivities; (3) there was an entrustment of a dangerous instrumentality; (4) the entrustee was negligent; and, (5) the decedent's death was proximately cased by the entrustee. See Prather, 981 S.W.2d at 806; Walker v. Harris, 924 S.W.2d 375, 377 (Tex.1996) (discussing Texas law on the foreseeability of torts). Defendant Scheopner's entrustment of a highly powerful weapon to a person with no training on its use or storage could foreseeably lead to the events of July 7, 1998. In addition, there is evidence that Defendant Moore allowed the rifle to be used by his son E. Moore, a highly unstable person who took Prozac, used cocaine and marijuana, and decorated his room with Neo-Nazi propaganda, and, as such, Defendant Moore could reasonably foresee that E. Moore would use the weapon to hurt someone.

DONE at Brownsville, Texas, this _____11th_____ day of April 2000.


Hilda G. Tagle
United States District Judge

24